W. SHARP, Judge,
dissenting.
I respectfully dissent. The modification of a permanent alimony award is a difficult case to appeal because the reviewing court must give the trial judge’s exercise of discretion a broad range[1] and this case is further complicated by two prior appeals, which have a stare decisis or “law of the case” effect. The issue on appeal in this modification case is whether, under the circumstances established at trial, the trial judge abused his discretion by awarding the former wife only a $200 per month increase in her permanent alimony award (for a total of $1,050 per month).
The trial judge found the former husband could afford to pay an increase in support. His gross income had substantially increased since 1983 (the time of the dissolution decree) from $46,404.80 to $81,-984.60 in 1990 (the time of the modification hearing). When the original dissolution judgment was appealed to this court,[2] we upheld the trial court’s property award, and a $700 per month permanent alimony award against the former wife’s claim that it was inadequate. We did, however, reverse the original judgment’s provisions that the former husband be liable to pay all of the former wife’s medical and dental costs, without any limitation. On remand in 1985, the trial court required the former husband to pay an additional $150 towards the former wife’s medical or insurance needs, or a total of $850 per month. This award was also appealed but was affirmed without opinion.[3]
*592 We are thus bound by the prior history of this case to take as our “start point” the determination that the $850 per month alimony award was adequate in 1985 to provide the former wife with the same modest life-style she enjoyed for twenty-six years while married to her former husband.[4] That is, perhaps, the whole problem with this case, since the evidence strongly suggests otherwise. For example, in 1981, the former wife had assets worth $37,900, debts of $9,600, and a total net worth of $28,300. In 1985, her assets were $20,445 and her net worth was $19,845. By 1990, her assets were $8,486, her debts exceeded $45,000, and her net worth was minus $32,588.
This record suggests two reasons for the former wife’s decline from modest comfort to insolvency. The first is that the original level of alimony awarded her was inadequate. She was forced to sell the marital home (three bedrooms with a pool) which had been awarded to her by way of equitable distribution, because it was in bad repair and she could not afford to maintain and keep it in a habitable condition. She used some of the proceeds to buy a trailer and furniture to go in it, and a new car to replace the ten-year-old one she had driven during the parties’ marriage. She put the balance (some $17,000) in a savings account in 1985. Since that time, she has had to draw on her savings to pay her living expenses. That sole capital resource which she was awarded in the dissolution judgment has now been exhausted down to the last $500.
The second reason the former wife has met with such fiscal adversity is that she fell and broke her hip in 1989, and her shoulder in 1986. Due in part to a preexisting health problem, moderately severe osteoporosis, her medical and hospital bills stemming from those injuries exceed $45,-000. She has no resources or income to make even partial payments on that extensive debt. She is being dunned by debt collectors and threatened with lawsuits.
Since 1983, the former wife’s medical condition has continued to deteriorate. She has a lamentably long litany of health and physical problems. At the time of the dissolution, she had osteoporosis and kyphosis (hunchback) and deafness. These conditions have worsened. She now has poor eyesight, loss of ability to fully raise her right arm above shoulder level, one leg shorter than the other due to the hip fracture (which requires her to wear a built-up shoe), arthritis in her knees and back, pulmonary problems partly due to her deteriorated spine, and chronic pain. She has gone from being “unemployable” in 1983, although competent to care for herself in her home, to being barely ambulatory in 1990, unable to walk without a cane or walker, unable to bathe herself and wash her own hair, or do any housework or laundry. Dr. Glenn, the former wife’s physician-orthopedist, described her in 1990 as “completely and totally disabled since 1988.” How much longer she will be able to live, unassisted and alone in her trailer home, appears problematic.
Based on this scenario, the trial judge found there had been a substantial change in circumstances since 1983 and 1985, and that an increase in permanent alimony should be awarded. I agree. But I question the increase of only $200 per month.
The $200 increase likely came from the former husband’s argument that the former wife was meeting all of her day-to-day expenses on her $850 per month alimony payment, plus an average withdrawal of $200 per month from her savings. However, those day-to-day expenses of living do not include any monies for repair of her car,[5] or funds (eventually), to replace it, part payment on any of the past-due $45,-000 in medical/hospital bills, attorney’s fee bills, counseling or rehabilitation for her depression and chronic alcoholism (which apparently existed at the time of the dissolution), paid assistance for housework and personal care, or medical insurance. In *593 1990, the cost of medical insurance quoted to the former wife was $450 per month and it did not include preexisting conditions. In sum, she is virtually uninsurable.
In attempting to rationalize the trial judge’s $200 per month increase, I conclude there are possibly two grounds. First, the former wife’s financial affidavit was inaccurate in some regards, and exaggerated her expenditures in others. In dissolution cases, this is not unusual, but it tends to harm the credibility of the party proffering such evidence. In this case, the discrepancies in expenses perhaps totalled $200 per month, at the most. Backing those out, the former wife’s bare living expenses totalled approximately $1,050 per month. But this figure still does not include any funds for the purposes listed above.
The second possible reason for such a low award in this case is that the trial judge thought the former wife was substantially to blame for her hip and shoulder injuries, which had created most of her $45,000 medical and hospital debt and had increased her physical handicaps. The record suggests that the former wife was an alcoholic in 1983 and has continued to abuse alcohol through date of the hearing on modification. When she broke her hip, she had a B.A.L. of .252. She admits she drinks two six-packs of beer per week. One doctor testified alcoholism could make osteoporosis more severe. The former wife has not sought counseling or rehabilitation, claiming insufficient funds. But all the medical witnesses who testified in 1990, as well as 1983, said that the cause of osteoporosis (a decrease of bone mass), which is the former wife’s primary health problem, is unknown, and that it is irreversible and probably progressive.
The trial court may also have thought the former husband should not be required to pay any of the 1986 and 1989 $45,000 medical and hospital debt because the former wife failed to purchase medical insurance. In the final judgment the court rebuked her because she did not purchase medical insurance in 1987, when she still had a few thousand dollars left in her savings account. A close look at the testimony persuades me this is an unrealistic expectation.
The only testimony in the record was that the former wife got a quote of $220 per month for medical insurance in 1985. She did not testify as to any quote or offer in 1987. In 1985, the $150 allotment was clearly insufficient to pay for the insurance and she testified she could not then afford it.
Had the former wife spent $220 per month from her savings to buy medical insurance, commencing in 1985 when she had a total “nest egg” of $17,000, she would have spent $10,540 on insurance over that time period, until her hip injury in 1989. However, since she was also required to draw down $200 per month to meet ordinary living expenses or $2,400 per year, her savings would have been completely exhausted before her hip injury in 1989. Her situation would not have been any different then as it is now. She would have had no current medical insurance at the time of her 1989 fall. However, her savings account would have been completely exhausted by mid-1988.
I conclude that although the former husband should not be burdened with the former wife’s horrendous medical debts, based on the “law of the case”, since he has the ability to do so, he should be required to support her in a manner commensurate with her current needs and a modest lifestyle. Such an award should include all categories of her needs, not just the day-today ones. For example, some allotment should have been made for car repairs, assisted-living costs, taxes, replacement of needed medical equipment such as hearing aides, eye glasses, back brace, raised shoe, and pest control and maintenance of her trailer and lot. Even with a $200 increase in her alimony award I think this case is a perfect illustration of one spouse passing from relative “prosperity to misfortune.” Canakaris, 382 So.2d 1197, 1204. I would remand for an award which encompasses all of the former wife’s current basic household and medically related needs. See Walter v. Walter, 464 So.2d 538 (Fla.1985); Gibson v. Gibson, 596 So.2d 1223 *594 (Fla. 2d DCA 1992); Laurenzo v. Laurenzo, 522 So.2d 1065 (Fla. 3d DCA 1988); England v. England, 520 So.2d 699 (Fla. 4th DCA 1988); Shrine v. Shrine, 454 So.2d 26 (Fla. 1st DCA), rev. denied, 461 So.2d 116 (Fla.1984)).
I would also make an award of appellate attorney’s fees in this case to the former wife, and remand to the trial court to determine the amount. Although the former wife did not file a separate motion apart from her initial brief,[6] she did file a timely motion with this court for costs and fees pending the appeal pursuant to section 61.-16. In that motion, she stated that she was indigent (the lower court has so certified) and that she would owe her attorney $4,625 for handling this appeal. This court denied that motion because we could not tell at that point (no record and no briefs yet filed) whether the appeal was brought in good faith, and whether there were reasonable grounds to believe it could be successful.[7] As a matter of procedure, we could now revisit our prior denial of the interim award.
If “merit” and “good faith” are the proper criteria for awarding appellate fees in dissolution cases to a needy spouse,[8] I think both grounds were met here. I have reviewed the record and briefs and am convinced it was not a frivolous appeal. Or, if the proper criteria is the disparate financial circumstance of the parties, without regard to “merit” or winning on appeal, then I submit the former wife is entitled to some fee award.[9] The trial court awarded her attorney’s fees in the modification proceeding below and the parties’ greatly disparate financial circumstances most probably have continued. To deny the former wife any appellate fees for this appeal because she lost will serve to close the appellate process to other impecunious spouses in dissolution cases.[10] What attorney will be willing to take such a case? Or do we really want to restrict appeals by such persons? If so, we should deny motions for appellate fees for all impecunious parties in dissolution cases unless he or she wins the appeal, and admit that is what we are doing.

. Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980).

. Miller v. Miller, 466 So.2d 356 (Fla. 5th DCA 1985).

. Miller v. Miller, 511 So.2d 1007 (Fla. 5th DCA 1987).

. Hamlet v. Hamlet, 583 So.2d 654 (Fla.1991); Walter v. Walter, 464 So.2d 538 (Fla.1985); Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980).

. The former wife proffered a current $500 estimated bill for repairs on the car.

. The proper method to seek appellate attorney's fees pursuant to Florida Rule of Appellate Procedure is to file a separate motion no later than the time for service of the reply brief. Florida Department of Commerce, Division of Risk Management v. Davies, 379 So.2d 1313 (Fla. 1st DCA 1980).

. Miller v. Miller, 586 So.2d 1315 (Fla. 5th DCA 1991) (Sharp, W., J., dissenting.)

. Id.

. Miller v. Miller, 586 So.2d 1315, 1317 (Fla. 5th DCA 1991) (Sharp, W., J., dissenting); Thornton v. Thornton, 433 So.2d 682 (Fla. 5th DCA), rev. denied, 443 So.2d 980 (Fla.1983); Dresser v. Dresser, 350 So.2d 1152 (Fla. 1st DCA 1977).

. Report of Florida Supreme Court Gender Bias Study Commission, Executive Summary, at p. 6 (1990).